# IN THE UNITED STATED DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| DEMETRICE ADAMS ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No: |
| ) | |
| GAVIN RECTOR, ) | JURY DEMAND |
| TYLER COMP, ) | |
| AHSCARI VALENCIA, ) | |
| AND ) | |
| GARRETT WRIGHT, ) | |
| ) | |
| *Defendants.* ) | |

## COMPLAINT

1. Plaintiff Demetrice Adams brings this civil rights action pursuant to 42 U.S.C. § 1983 for damages against Defendants Gavin Rector, Tyler Comp, Ahscari Valencia, and Garrett Wright, who are all law enforcement officers employed by the Metro Nashville Airport Authority ("MNAA") Department of Public Safety. The lawsuit stems from a December 6, 2023 false arrest for DUI.

## **PARTIES**

2. Plaintiff Demetrice Adams ("Mr. Adams") is an adult resident of Wilson County, TN.

3. Defendant Gavin Rector ("Officer Rector") is an adult resident of Williamson County, TN.

4. Defendant Tyler Comp ("Officer Comp") is an adult resident of Wilson County, TN.

5. Defendant Ahscari Valencia ("Officer Valencia") is an adult resident of Putnam County, TN.

6. Officer Garrett Dakota Wright ("Officer Wright") is an adult resident of Sumner County, TN.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A. Demetrice Adams: Building a Career as a Professional Driver

8. Mr. Demetrice Adams is a professional driver for Williamson County Schools, currently training to drive school buses. He resides in Lebanon, Tennessee.

9. Mr. Adams has no criminal record. He has a clean driving record, has never caused or been in a driving accident, and, prior to the incident at issue in this lawsuit, had not had so much as a ticket in more than a decade.

10. Mr. Adams is a licensed driver with a Commercial Drivers License ("CDL"). He completed his CDL training in March of 2023.

11. Until the events at issue in this case, Mr. Adams was a shuttle driver for ABM Aviation, Inc. ("ABM"). Mr. Adams's job was to shuttle airport employees back and forth between the airport terminal and the employee parking lot.

12. At the time that the incident underlying this case occurred Mr. Adams had also recently obtained a job as a salaried driver for the Metro Action Committee ("MAC") of Nashville and Davidson County for their Head Start program. Mr. Adams was on a six-month probationary period with MAC as a recent hire.

### B. Airport Officers Confront Mr. Adams after Observing him Safely Driving his Airport Shuttle

13. On the night of December 6, 2023, Mr. Adams was working for ABM and driving an airport-employee shuttle bus.

14. MNAA Public Safety Officers received a report from dispatch that a shuttle rider had complained about Mr. Adams' driving. After receiving the report, Defendants investigated.

15. Defendant Gavin Rector, an MNAA Officer, followed Mr. Adams's bus as part of that investigation. Video from the shuttle bus was recorded and retained by ABM, and shows the period that Mr. Adams was being followed by Officer Rector.

16. The ABM video shows that Mr. Adams drove steadily and cautiously. He also generally maintained the vehicle in the non-passing lane so that faster and speeding vehicles could safely pass by, and he diligently stopped at all intersections and passenger pick-up locations.

17. However, Officer Gavin Rector claimed that when he followed the shuttle bus he "observed the Bus fail to maintain [its] lane … crossing over the dashed line dividing the lanes of travel multiple times, and had very significant fluctuation of speeds [sic]."

18. Based on the complaint from dispatch and Officer Rector's supposed observations, which are contradicted by the shuttle video, MNAA Officers decided to investigate Mr. Adams further.

19. Multiple Public Safety Officers, including Defendants, waited at the terminal parking garage for the shuttle. Once Mr. Adams parked it at the garage, three officers boarded the bus and approached Mr. Adams.

20. Mr. Adams was nervous and surprised upon being confronted by Defendants and other officers. Mr. Adams was communicating with ABM dispatch at the time that officers began to address him, and was uncertain as to why they had boarded his shuttle.

21. Officer Wright was the first to speak with Mr. Adams. Wright said that they "were just getting reports" about Adams's erratic driving and that "it was not a big deal." Wright then asked Mr. Adams to show him his ID.

22. While he was speaking with Wright, Mr. Adams continued receiving messages over his dispatch radio, which Adams felt he should respond to. Wright never asked Adams to end his conversation with dispatch, and reiterated that the situation was "no big deal." Consequently, Mr. Adams continued responding to dispatch while simultaneously talking to Wright.

23. Officers Rector would later mischaracterize this initial interaction as showing that Mr. Adams "was slow to respond, seemed confused and preoccupied, and was unable to stay focused on

tasks." In fact, Officer Wright did nothing to request Mr. Adams' full attention and indicated the opposite by continually reassuring him that there was no urgency to his questioning.

24. The officers then asked Mr. Adams if he was possibly under the influence. Mr. Adams denied that he was.

25. The two Managers for ABM that were on-duty that night, Paul Harvey and Richard Green, became aware of the officers' investigation and came to the terminal garage.

26. Officer Rector asked Mr. Adams to perform Field Sobriety Tests ("FST's") and he did so.

27. Mr. Adams performed all three FST's well in spite of his nervousness and embarrassment.

28. ABM Manager Paul Harvey, himself a former police officer with experience in DUI cases and FST's, watched Mr. Adams perform the FST's and perceived that Mr. Adams did well, despite his visible nervousness.

29. However, Officer Rector claimed that Mr. Adams "performed poorly in all of the three" FST's.

### C. Airport Officers Arrest Mr. Adams for DUI And Make False Claims to Justify the Arrest

30. The Defendants then arrested Mr. Adams for DUI at around 9:30 PM, handcuffing him and taking him into custody.

31. The arrest happened in full view of multiple members of the public, by nature of occurring in an airport garage open to and frequented by the general public, and Mr. Adams' managers, and was extremely humiliating for Mr. Adams.

32. Defendants took Mr. Adams to have his blood drawn at Nashville General Hospital. At the direction of Defendants, Hospital staff drew Mr. Adams's blood, and had it sent off for laboratory testing with the Tennessee Bureau of Investigation ("TBI").

33. Defendants then delivered Mr. Adams to the Davidson County jail, where he was booked just after 1 AM.

34. MNAA Officers drafted an "Offense/Incident Report" ("Incident Report") detailing the investigation and explaining the basis for the arrest.

35. Defendant Garrett Wright included a supplemental report in the Incident Report, in which Wright claimed that an ABM manager had, during the initial investigation around 9 PM, told him that "he believed [Mr. Adams] was under the influence."

36. However, in reality neither Paul Harvey nor Richard Green, the only two managers present for ABM, had made that statement or anything that could be similarly construed.

37. Defendants Comp and Ahscari, two other MNAA Officers, are listed as the "Approving Officers" on the Incident Report. On information and belief, Defendants Comp and Ahscari did in fact formally approve the decision to arrest Plaintiff.

38. In order to initiate criminal DUI charges against Mr. Adams, Defendant Rector drafted a warrant affidavit and presented it to a Davidson County Commissioner.

39. In the body of the affidavit, Officer Rector falsely claimed that Mr. Adams' driving was erratic in that he was "crossing over the dashed line dividing the lanes of travel multiple times, and had very significant fluctuation of speeds [sic]", that Mr. Adams was "confused and preoccupied" during his initial contact with Officer Wright, and that Mr. Adams had shown "multiple signs of impairment while performing the" FST's.

40. However, each of Rector's allegations in support of the arrest warrant was false.

41. Many of these blatantly false claims were contradicted by the ABM footage, which documented both Mr. Adams's driving and much of the Defendants' investigation.

42. In addition, ABM Manager Paul Harvey personally reviewed the video footage from the shuttle, specifically to assess Mr. Adams' driving at the time leading up to Mr. Adams' arrest. Bringing his experience as a former police officer with DUI detection training to bear, Mr. Harvey concluded that Mr. Adams drove safely and well. Mr. Harvey noted that Mr. Adams had specifically showed an awareness of and compliance with ABM directives to its drivers, including driving slightly below the posted speed limit to assure passenger safety. Mr. Harvey thoroughly reviewed the footage, but was unable to find a single example in the video that corroborated Officer Rector's statements.

43. Based on Rector's false allegations, the Commissioner issued the DUI charges against Mr. Adams.

44. The Commissioner then ordered Mr. Adams released from jail on Davidson County's Pretrial Release program. However, Mr. Adams remained incarcerated for hours while he was processed out on Pretrial Release.

45. While on Pretrial Release supervision, Mr. Adams was required to install an ignition interlock device as a bond condition and did so to be able to continue driving.

### D. Mr. Adams Is Placed on Leave and Publicly Smeared as a Consequence of the False Arrest

46. The day after the arrest, ABM placed him on administrative leave from the shuttle driver position while the DUI charge was pending. ABM also required Mr. Adams to give a urine sample, which ABM then sent off to a private lab for drug testing.

47. Multiple news stories were published about Mr. Adam's arrest, highlighting the sensational aspect of an airport shuttle driver being arrested for DUI.

48. Mr. Adams's DUI charges were set for court. To prepare for his court appearance, Mr. Adams hired an attorney to defend him against the unfounded criminal charge.

49. Because Mr. Adams was a diligent and valued employee, ABM attempted to transfer him to another, non-driving position at the airport at the same rate of pay during the pendency of the charges. However, Mr. Adams was denied a necessary security clearance for this alternate position by MNAA because of the DUI charge.

50. Mr. Adams' other employer, MAC, also placed him on administrative leave from his salaried driver position due to the DUI charge and the associated news coverage.

51. The suspension of both of Mr. Adams's jobs inflicted a severe and sudden loss of income on him. The combination of this loss of income with the need to hire a criminal defense attorney was financially devastating for him, causing Mr. Adams to fall behind on his mortgage, student loan, and car insurance payments. As a result, his car insurance was terminated.

### E. Multiple Lab Tests Prove that Mr. Adams Was Never Intoxicated

52. Approximately two months after Mr. Adams was arrested, lab testing conducted by the TBI on the blood sample given by Mr. Adams showed that there was no alcohol in his system on the day of the arrest.

53. A private lab tested the urine sample that ABM had taken the day after the arrest, and likewise determined that there were no controlled substances in Mr. Adams's system.

54. On February 21, 2024, the District Attorneys' Office took a *nolle prosequi* in the criminal case against Mr. Adams, dropping the charges.

55. After the criminal charges had been dropped, ABM offered Mr. Adams the opportunity to return to work for ABM as an airport shuttle driver. However, because of Mr. Adams's trauma from the arrest and charges he has been too afraid to return to work at the airport.

56. While Mr. Adams now has the opportunity to potentially return to working at the salaried position as a driver for MAC, he would be required to re-apply first.

### CLAIMS FOR RELIEF

### Count I: False Arrest in Violation of the Fourth Amendment (42 U.S.C § 1983) (Defendants Rector, Wright, Comp, and Valencia)

57. Plaintiff re-alleges and incorporates Paragraphs 1 – 56 above by reference.

58. Officer Rector falsely arrested Mr. Adams on December 6, 2023. Officer Wright participated in the decision to falsely arrest Mr. Adams, and wrote false and misleading allegations in an incident report to justify it. Officers Valencia and Comp supervised Officer Rector and approved of Mr. Adams' false arrest.

59. Defendants were operating under color of state law when they arrested Mr. Adams.

60. Defendants lacked probable cause to believe that Mr. Adams had committed any criminal offense.

61. Defendants' false arrest deprived Mr. Adams of his liberty.

62. Defendants' false arrest was in reckless disregard of Mr. Adams' rights.

63. Defendants' false arrest damaged Mr. Adams by depriving of his liberty, inflicting emotional distress on him, costing him financially, and inflicting reputational damage on him.

### Count II: Malicious Prosecution in Violation of the Fourth Amendment
### (42 U.S.C § 1983)
### (Defendants Rector, Wright, Comp, and Valencia)

64. Plaintiff re-alleges and incorporates Paragraphs 1 – 56 above by reference.

65. On December 6, 2023, Officer Rector falsely charged Mr. Adams with the Tennessee state criminal offense of Driving Under the Influence, T.C.A. § 55-10-401.

66. The false charge deprived Mr. Adams of his liberty by causing him to be jailed and then subjecting him to the conditions of the Pretrial Release program.

67. Officer Rector was the named Prosecutor of the false charges. On information and belief, the other Defendants participated in and approved of the decision to charge Mr. Adams with DUI.

68. Defendants were operating under color of state law when they initiated the false charge against Mr. Adams.

69. Defendants charged Mr. Adams with the false DUI without probable cause to believe that Mr. Adams was guilty of that offense.

70. Defendants initiated the false charges in reckless disregard of Mr. Adams' rights.

71. The false DUI charges were resolved in Mr. Adams's favor, with a *nolle prosequi*.

72. The false DUI charges damaged Mr. Adams by depriving him of his liberty, inflicting emotional distress on him, costing him financially, and inflicting reputational damage on him.

### REQUEST FOR RELIEF

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal damages against the Defendants on all counts.

5. That Plaintiff be awarded compensatory damages against the Defendants in an amount to be determined by the jury.

6. That Plaintiff be awarded punitive damages against Defendants in an amount to be determined by the jury.

7. That Defendants be ordered to compensate Plaintiff's attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear he is entitled in the interests of justice.

Respectfully submitted,

*s/ Aaron Rothbaum*
Aaron Rothbaum
7000 Executive Center Dr., Suite 240
Brentwood, TN 37027
615.436.0290